SHOPMEN'S LOCAL UNION NO. 455, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRON WORKERS, A.F.L.–C.I.O., Appellee,

and

National Labor Relations Board, Intervenor,

v.

KEVIN STEEL PRODUCTS, INC., Appellant.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

KEVIN STEEL PRODUCTS, INC., Respondent.

Nos. 581, 811, Dockets 74–1872, 74–2154.

United States Court of Appeals, Second Circuit.

Argued June 11, 1975.

Decided July 24, 1975.

Mitchel B. Craner, New York City (Guazzo, Silagi & Craner, P. C., Stephen E. Klausner, New York City, on the brief), for appellant-respondent Kevin Steel Products, Inc.

Belle Harper, New York City (Sipser, Weinstock, Harper & Dorn, I. Philip Sipser, Jerome Tauber, New York City, on the brief), for appellee Shopmen's Local Union No. 455.

Peter J. Carre, Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Abigail Cooley, Asst. Gen. Counsel for Special Litigation; Sandra R. McCand-

less, Atty., on the brief), for intervenor-petitioner N.L.R.B.

Before FEINBERG, OAKES and VAN GRAAFEILAND, Circuit Judges.

FEINBERG, Circuit Judge:

This case squarely presents to an appellate court, apparently for the first time, the question whether section 313(1) of the Bankruptcy Act allows rejection of a collective bargaining agreement as an executory contract. We conclude that the answer is yes, despite the position of the National Labor Relations Board that there is a direct conflict between the Bankruptcy Act and the National Labor Relations Act in which the Labor Act must prevail in order to preserve "industrial peace." [1] We view the matter in less apocalyptic terms and believe that, in the case before us, the effect of the two statutes can be reconciled.

## I

Kevin Steel Products, Inc., a steel fabricator and erector located in West Haverstraw, New York, and a debtor-in-possession (the debtor) under Chapter XI of the Bankruptcy Act, appeals from a decision of Judge Whitman Knapp in the United States District Court for the Southern District of New York that the court had no power to allow the debtor to reject a collective bargaining agreement with appellee Shopmen's Local Union No. 455, International Association of Bridge, Structural and Ornamental Iron Workers, A.F.L.–C.I.O., 381 F.Supp. 336 (1974). Kevin Steel had filed a petiton for an arrangement under Chapter XI in September 1973, and Bankruptcy Judge Howard Schwartzberg had authorized Kevin Steel as debtor-in-possession to operate the business under the court's control.[2] Thereafter, the debtor petitioned the bankruptcy court for permis-

sion to reject as an onerous executory contract the collective bargaining agreement with the union.[3] In March 1974, the bankruptcy judge granted the petition. The union appealed, and in August Judge Knapp reversed the decision of the bankruptcy judge. This appeal by the debtor followed.

While the parties were skirmishing in the bankruptcy court, another proceeding was in progress before the National Labor Relations Board, growing out of a labor dispute between Kevin Steel and the union. The two had been in a collective bargaining relationship since 1968 when a two-year contract was signed. They then entered into a three-year agreement for the period July 1, 1970 to June 30, 1973. There were about 15 employees in the unit in early 1973. The relationship deteriorated, culminating in a charge filed by the union with the Labor Board in June 1973, alleging that the company had violated sections 8(a)(1), (3) and (5) of the National Labor Relations Act by offering an employee an inducement to abandon the union, by laying off and subsequently terminating employees because of a shop steward's insistence on strict enforcement of the collective bargaining agreement, and by refusing, on and after June 1, 1973, to sign a document embodying a new agreement between the union and the company. In July 1973, a complaint issued; in November, the Administrative Law Judge found that the violations had indeed been committed, and in March 1974, the Board affirmed his decision. 209 N.L.R.B. No. 80. The Board ordered Kevin Steel, "its officers, agents, successors, and assigns" to cease and desist from various practices and, most significantly for us, required the company to execute the contract submitted by the union in June 1973, giving it retroactive effect from July 1, 1973; the Board also

---

1. Brief for the National Labor Relations Board as Intervenor-Petitioner ("Board brief"), at 13–15, 23.

2. Pursuant to § 343 of the Bankruptcy Act, 11 U.S.C. § 743.

3. The company had two other bargaining agreements with other unions. One contract covered the company's outside iron workers, and the other covered its truck drivers. There has been no effort to reject these agreements.

ordered Kevin Steel to make the employees whole for any loss of wages or other benefits suffered as a result of its failure to sign the agreement and to offer reinstatement to the unlawfully discharged employees. There was no compliance with the Board's decision, and the Board applied to this court for enforcement of its order.

In October 1974, the parties in the two proceedings filed a joint motion for consolidation of the appeal of the debtor (Docket No. 74–2154) and the Board's petition for enforcement (Docket No. 74–1872). This was granted, pursuant to an agreement that the Board's decision and order in the latter proceeding is part of the record on appeal in the former and that:

> [T]he Company agreed to the entry of a consent judgment by this Court enforcing the Board's order with respect to the violations of Section 8(a)(1) and (3) of the Act and stipulated that it would not contest the Board's findings of fact and conclusions of law with respect to the violation of Section 8(a)(5). Insofar as the effect of enforcement in Docket No. 74–1872 of the Board's order remedying the Section 8(a)(5) violation is dependent upon the outcome of the Company's appeal in Docket No. 74–2154, the bankruptcy proceeding, the Board and the Company agreed that enforcement of the Section 8(a)(5) portion of the Board's order be held in abeyance pending the outcome of said bankruptcy proceeding.

Thus, on the debtor's appeal, the Board and the union join to support Judge Knapp's order, which refused to allow the debtor to reject the contract that the Labor Board had ordered Kevin Steel and its successors to sign. The basis of the judge's ruling was that the power of "the Bankruptcy Court [to] relieve a debtor from the burdens of any executory contract" did not apply to collective bargaining agreements. 381 F.Supp. at 338. To the validity of this proposition we now turn.

## II

Appellant debtor argues on appeal that the district court erred in its constricted reading of the Bankruptcy Act. The debtor relies on the language of section 313(1) of that Act, 11 U.S.C. § 713(1), the unbroken string of cases supporting the debtor's view, and evidence of congressional intent. Section 313(1) provides that:

> Upon the filing of a petition, the court may, in addition to the jurisdiction, powers, and duties conferred and imposed upon it by this chapter—
>
> (1) permit the rejection of executory contracts of the debtor, upon notice to the parties to such contracts and to such other parties in interest as the court may designate.

The section is phrased in broad terms. The debtor cites the leading text, which points out that the language contains "no restriction on the type of executory contract that may be rejected. The power in that respect is therefore broader in a Chapter XI case than in a Chapter X case, since an executory contract in the public authority cannot be rejected under Chapter X." (Footnotes omitted.) 8 Collier on Bankruptcy ¶ 3.15[1] (14th ed. rev. 1975). The debtor calls to our attention prior decisions, all of which construe this, or similar, sections of the Bankruptcy Act authorizing rejection of executory contracts[4] as applying to collective bargaining agreements. E. g., *Carpenters Local 2746 v. Turney Wood Products Inc.*, 289 F.Supp. 143, 147–50 (W.D.Ark.1968); *In re Overseas National Airways, Inc.*, 238 F.Supp. 359, 361 (E.D.N.Y.1965); *In re Klaber Bros., Inc.*, 173 F.Supp. 83 (S.D.N.Y.1959); *In re Public Ledger, Inc.*, 63 F.Supp. 1008 (E.D.Pa.1945), rev'd in part, 161 F.2d 762 (3d Cir.1947). And we are told that the unlimited scope of the statutory language has been relied on by the courts. E. g., *Car-*

---

4. The comparable section in straight bankruptcy is 70b, 11 U.S.C. § 110(b), and in Chapter X corporate reorganization, § 116(1), 11 U.S.C. § 516(1).

penters Local 2746, supra, 289 F.Supp. at 147; In re Klaber Bros., Inc., supra, 173 F.Supp. at 85.

As to congressional intent, the debtor argues that Congress certainly knew how to carve labor agreements out of a general grant of power to reject executory contracts. This is precisely what Congress did in section 77(n) of the Bankruptcy Act, 11 U.S.C. § 205(n), which specifically prohibits a bankruptcy court or trustee from changing wages or working conditions of railroad employees except in the manner prescribed in the Railway Labor Act, 45 U.S.C. § 151 et seq.[5] See In re Overseas National Airways, supra. The failure of Congress similarly to limit section 313(1), according to the debtor, shows a clear intention to include labor contracts within its scope.

Appellees respond to these arguments as follows: The precedents are scanty and, in any event, are not binding because "the issue of whether the Bankruptcy Act confers the power to reject collective bargaining agreements has never been presented to the appellate courts."[6] Moreover, the broad language of the statute is not controlling; it must be interpreted in light of "other directly conflicting statutory provisions,"[7] the enormous difference between a labor agreement and an ordinary commercial contract, congressional intent in enacting the Bankruptcy Act and the Labor Act, and considerations of policy, all of which require a conclusion that bankruptcy courts do not possess the power to set aside collective bargaining agreements.

With regard to the precedents, appellees argue not only that they are few and not controlling, but also that they are wrongly decided because they rely on a literal reading of section 313(1) or analogous sections. This is a mistake, we are told, because such a construction creates an otherwise avoidable direct conflict with sections 8(a)(5) and (d) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) and (d). The former makes it an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees. The latter defines that duty and imposes certain procedures and conditions upon the termination or modification of a labor agreement.[8] Section 8(d) is absolute on its face. Yet, the Board urges, a holding that section 313(1) of the Bankruptcy Act authorizes rejection of collective bargaining agreements means that a company can accomplish indirectly what it could not do directly without violating the Labor Act, namely, the unilateral termination of a labor agreement during its term. Congress, we are told, could not have meant to

5. Section 77(n) provides in relevant part:
   No judge or trustee acting under this title shall change the wages or working conditions of railroad employees except in the manner prescribed in sections 151 to 163 of Title 45, as amended June 21, 1934, or as they may be hereafter amended.

6. Board brief, at 10–11 n. 9. See also brief of appellee Shopmen's Local Union No. 455 ("union brief"), at 21.

7. Board brief, at 12.

8. Under § 8(d), no "party" to a collective bargaining agreement shall "terminate or modify" it unless the "party" desiring such change
   (1) serves a written notice upon the other party to the contract . . . :
   (2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;
   (3) notifies the Federal Mediation and Conciliation Service and . . . any State or Territorial agency established to mediate and conciliate disputes within the State or Territory . . . ;
   (4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:
   . . . [T]he duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. . . .

sanction such an undermining of the policies of the Labor Act.

Appellees find further support for their position in *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), and *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), which make clear the peculiar status of a collective bargaining agreement. In *Wiley*, supra, the Court took pains to point out that a labor agreement "is not an ordinary contract," and quoted with approval its earlier observations to the same effect in *Warrior & Gulf*, supra, 363 U.S. at 578–79, 80 S.Ct. 1347.[9] Appellees argue that the unique nature of labor agreements is further evidence that Congress did not regard them as commercial executory "contracts" that could be rejected in bankruptcy proceedings. Indeed, appellees say that section 77(n), relied on by the debtor,[10] supports their position because "the intent to encourage the specific enforcement of collective bargaining agreements behind the Railway Labor Act and the NLRA is essentially the same."[11]

Finally, appellees argue that public policy considerations suggest that collective bargaining agreements cannot be rejected in bankruptcy proceedings. Any other ruling, they say, encourages the use of bankruptcy as a refuge for businesses that would prefer to operate free of union contracts. Furthermore, permitting rejection at the expense of employees impairs industrial peace, since the only means employees have to protect the losses they will suffer in such a situation is to strike.

Merely the statement of the contending positions indicates that the issue is not a simple one to be decided only by a literal reading of section 313(1). Yet, we believe the debtor has the better of it in these volleys back and forth. Certainly the language of section 313(1) is a good place to start any analysis, and it is obviously broad in its literal scope. In an analogous situation, the Supreme Court has read the Bankruptcy Act literally even though the policy of the Labor Act called for a different result. In *United States v. Embassy Restaurant, Inc.*, 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601 (1959), the Court held that employer contributions to a union welfare fund are not "wages . . . due to workmen" under section 64a(2) of the Bankruptcy Act, 11 U.S.C. § 104(a)(2), although the Court recognized that "various fringe benefits are wages" under the Labor Act. *Id.* at 33, 79 S.Ct. 554. See also *Electrical Industry Joint Board v. United States*, 391 U.S. 224, 88 S.Ct. 1491, 120 L.Ed.2d 546 (1969) (same result with respect to contributions to annuity plan).

The reported cases directly on point do either hold or assume that the expansive language of Section 313(1), or of analogous sections, reaches collective bargaining agreements. See cases at pp. 701–702 *supra*. We recognize that there appear to be no appellate decisions squarely on point. The issue, of course, has not been litigated frequently. The reasons are not difficult to discern. In a Chapter X or XI proceeding, which is designed to preserve a going business, only a hardy—some might say foolhardy—employer would provoke a strike by trying to terminate an existing labor contract. See e. g., *In re Public Ledger, Inc.*, supra, 161 F.2d at 766–67. And in a straight bankruptcy proceeding, which normally results in liquidation, there are usually no jobs or wage rates to preserve for any appreciable period, and the claims of employees are furnished some

9. [A collective bargaining agreement] . . is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate . . . .. The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant.

376 U.S. at 550, 84 S.Ct. at 914. See also *Warrior & Gulf*, supra, 363 U.S. at 580, 80 S.Ct. 1347.

10. See note 5, *supra*.

11. Board brief, at 19 n. 16. See also union brief, at 33–35.

protection by other sections of the Bankruptcy Act.[12] We do not suggest that executory labor agreements are not rejected in straight bankruptcy proceedings. They are, as the Board concedes, "frequently perfunctorily rejected." [13] But in that situation, there is little incentive to litigate the issue. One reason, therefore, for the absence of many cases on point even at the trial level is that the stakes are either too high or too low.

These reasons and the practical considerations of additional expense and delay help explain the absence of appellate decisions, as well. But more important may be a general assumption that the basic existing law is as the bankruptcy judge found it here. See C. Morris, ed., The Developing Labor Law 817–18 (1971); Countryman, Executory Contracts in Bankruptcy: Part II, 58 Minn. L.Rev. 479, 492–98 (1974); cf. *In re American R.R. of Porto Rico,* 110 F.Supp. 45 (D.P.R.1952), aff'd, 202 F.2d 149 (1st Cir. 1953). While the precedents are not binding on us, they are hardly irrelevant.

▇▇▇▇ Moreover, appellees' claim that section 313(1) of the Bankruptcy Act must give way to sections 8(a)(5) and (d) of the Labor Act to avoid a direct conflict disappears on analysis. The argument fails to take into account the nature of a bankruptcy proceeding. A debtor-in-possession under Chapter XI or under Chapter X, a trustee under the latter chapter, or a trustee in a straight bankruptcy proceeding is *not* the same entity as the pre-bankruptcy company. A new entity is created with its own rights and duties, subject to the supervision of the bankruptcy court.[14] Included in these duties is the obligation to comply with the Labor Act. See *NLRB v. Baldwin Locomotive Works,* 128 F.2d 39, 43 (3d Cir. 1942) (en banc); *Durand v. NLRB,* 296 F.Supp. 1049, 1055 (W.D.Ark. 1969).[15] Such a trustee or debtor may be required, for example, to bargain collectively with the representative of a majority of its employees; if an agreement is then entered into with a union, section 8(d) governs its termination. It may be that the obligations of such a trustee or debtor are analogous to those of a successor employer, see Comment, Collective Bargaining and Bankruptcy, 42 S.Cal.L. Rev. 477 (1969), but that is a far cry from appellees' position that the debtor here must assume the outstanding labor contract. Were that so, the new entity would be in a worse position than a successor employer, who is generally not bound by the existing labor agreement. See *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 281–91, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); Note, The Bargaining Obligations of Successor Employers, 88 Harv.L.Rev. 759, 760 (1975). Until the debtor here assumes the old agreement or makes a new one, it is not a "party" under section 8(d) to any labor agreement with the union and is simply not subject to the termination restrictions of the section.

Appellees also argue that labor agreements are quite special and, therefore, Congress could not have intended section 313(1) to apply to them. We agree with the premise but not with the conclusion, because it attributes too much to congressional silence. As the debtor points out, section 77(n) of the Bankruptcy Act shows that Congress knew how to remove labor agreements from the scope of a general power to reject executory contracts.[16] It is true that Judge Knapp

---

12. E. g., § 17a(5), 11 U.S.C. § 35(a)(5); § 64a(2), 11 U.S.C. § 104(a)(2).

13. Board brief, at 23.

14. The Board argues, brief at 14–15, that in straight bankruptcy, the trustee can reject an executory contract without the approval of the bankruptcy court. Since the bankruptcy trustee is, in law, a different entity from the bankrupt, we fail to see the significance of this.

15. This case involved the same bankruptcy proceeding as *Carpenters Local 2746, supra.*

16. For another example of specific congressional action making Labor Act policies control, see § 15 of that Act, 29 U.S.C. § 165, overriding § 272 of the Bankruptcy Act, 11 U.S.C. § 672.

relied on section 77(n) in holding that he could not authorize rejection of the executory contract here, reasoning as follows:

> The NLRB . . . urges that the inclusion of the railway act exception indicates an expression of policy with respect to labor agreements, while the failure to include a similar exception with respect to labor in general is explainable as legislative oversight.
>
> Although the legislative history can probably be read as supporting any desired result, we are on balance persuaded of the soundness of the NLRB's view. In the last analysis it seems more logical to assume that the Congress intended to distinguish collective bargaining agreements as a class from all other contracts than that it intended to make seemingly irrelevant distinctions between different kinds of labor agreements.

381 F.Supp. at 338. We do not know whether the failure to include in section 313(1) language similar to that contained in section 77(n) is "explainable as legislative oversight." But certainly it would be wrong to assume that whatever Congress enacted with respect to the labor relations of those employers covered by the Railway Labor Act should automatically be applied to other employers. The distinct problems of the former group and their importance to the national economy are well recognized, see, e. g., *International Association of Machinists v. Central Airlines, Inc.,* 372 U.S. 682, 687–89, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963), and are highlighted by the differences between the Railway Labor Act and the National Labor Relations Act. E. g., the former provides for compulsory arbitration of "minor" disputes (grievances) by a National Mediation Board, *International Association of Machinists, supra; Elgin, J. & E. Ry. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), and the latter does not. It is possible to construct arguments one way or the other from the timetable of original enactment of the Labor Act in 1935, comprehensive revision of the Bankruptcy Act in 1938, addition of section 8(d) to the Labor Act in 1947, and so on. Both the Bankruptcy Act and the Labor Act, particularly the latter, have been subject to close scrutiny and amendments,[17] and despite numerous opportunities to change either or both acts with regard to the question before us, Congress has not done so.[18] Even if continued congressional inattention does explain the broad language of section 313(1), we do not think that we should at this late date hold that a law as technical as the Bankruptcy Act excludes by indirection the power to reject labor contracts. By doing so now, we would, in effect, be amending the statute. The remedy for any such "oversight," affecting two very important statutes, rests with the legislature. Cf. *Electrical Industry Joint Board, supra,* 391 U.S. at 229, 88 S.Ct. 1491, 20 L.Ed.2d 546.

Finally, we do not regard the policy arguments advanced by appellees in this context as particularly persuasive. Although the Board cites a few cases to justify its fear that businesses will swarm into bankruptcy proceedings in order to free themselves of labor agree-

---

17. E. g., amending the National Labor Relations Act: the Taft-Hartley Act, June 23, 1947, ch. 120, 61 Stat. 136; the Landrum-Griffin Act, Sept. 14, 1959, Pub.L. No. 86–257, 73 Stat. 519; amending the Bankruptcy Act: Act of July 1, 1946, ch. 532, 60 Stat. 409; Act of Sept. 25, 1962, Pub.L. No. 87–681, 76 Stat. 570; Acts of Nov. 28, 1967, Pub.L. Nos. 90–156, 90–157, 90–158, 81 Stat. 510, 511, 516; Act of Oct. 19, 1970, Pub.L. No. 91–467, 84 Stat. 990.

18. For examples of congressional awareness of interrelationships between the Bankruptcy and Labor Acts, see note 16 supra and accompanying text. Cf. § 206 of the Bankruptcy Act, 11 U.S.C. § 606, which permits unions to be "heard on the economic soundness" of a Chapter X reorganization plan. The stormy history of the latter provision protecting labor interests is discussed in 6A Collier, *supra,* ¶ 9.24.

ments,[19] we doubt that many will attempt to do so. The adverse consequences of bankruptcy are ordinarily far too harsh for that. In addition, as indicated above, the paucity of cases raising this issue in reorganization or arrangement proceedings is probably due to precisely the reverse reason; i. e., businessmen make the best bargain they can with unions if they want to stay in business. Similarly, the specter of industrial unrest fades when the number of cases in which this issue appears is examined. In any event, these policy considerations are more properly directed to the legislature.

Thus, we conclude that section 313(1) of the Bankruptcy Act does permit rejection of a labor agreement.[20] We do not see any irreconcilable conflict here between the Bankruptcy Act and the National Labor Relations Act. We recognize, of course, that the policies animating the two statutes are different. The bankruptcy law is meant "to preserve the funds of the debtor for distribution to creditors and to give the debtor a new start, while the basic policy of the labor law is always to encourage creation and enforcement of collective bargaining agreements." Comment, Collective Bargaining and Bankruptcy, supra, 42 S.Cal.L.Rev. at 477. Should Congress prefer to alter the present balance between these policies, it can do so. But it must be remembered that, as noted above, the Bankruptcy Act even in its present form does not authorize a debtor-in-possession to ignore its obligations under the Labor Act any more than it can ignore those imposed by the Internal Revenue Code. See generally, 3A Collier, supra, ¶ 62.14[3]; cf. *Otte v. United States*, 419 U.S. 43, 95 S.Ct. 247, 42 L.Ed.2d 212 (1974). Finally, because of the importance of the policies behind the Labor Act, bankruptcy courts must scrutinize with particular care petitions to reject collective bargaining agreements, a subject which we discuss below.

### III

Although we have determined that the district court had the power to permit the debtor to reject Kevin Steel's contract with the union, the case does not end there. The crucial issue remains whether the bankruptcy judge properly granted such permission in this case. The district court, undoubtedly because of its erroneous view as to lack of power, disposed of this question summarily.[21] The union argues to us that even if the Bankruptcy Act permits rejection of an executory labor agreement, on the present state of the record an accommodation of the policies of that Act and the Labor Act requires denial of such relief.[22] Although not an appellant since

19. E. g., *Teamsters Local 886 v. Quick Charge, Inc.*, 168 F.2d 513, 515–16 (10th Cir. 1948); *In re Mamie Conti Gowns, Inc.*, 12 F.Supp. 478, 480 (S.D.N.Y.1935); *In re Cleveland & Sandusky Brewing Co.*, 11 F.Supp. 198, 207 (N.D. Ohio 1935). Cf. *In re Klaber Bros., Inc., supra.*

20. We note that we are not asked to decide whether the debtor, in view of the partial consent judgment in Docket No. 74–1872, referred to supra at p. 701, must reinstate discriminatorily laid-off employees with back pay, cf. *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); nor do we deal with the status of any monetary claims based upon pre-bankruptcy violations of the Labor Act. Cf. *Nathanson v. NLRB*, 344 U.S. 25, 73 S.Ct. 80, 97 L.Ed. 23 (1952).

21. The court stated:

[W]e agree with Judge Schwartzberg's finding that the collective bargaining agreement—all things being equal—is suf⸳⸳ burdensome and onerous to the de⸳ ⸳ warrant its rejection . . . . W .nd quite beside the point the argument [the union] and the NLRB that every employer considers onerous its collective bargaining agreement but is nevertheless required to honor it. That argument overlooks the salient fact that this employer has been found to be suffering financial distress sufficient to justify a Chapter XI petition and the relief from onerous obligations that such chapter was designed to provide.
381 F.Supp. at 338.

22. As examples of similar accommodations, the union cites *Boys Markets, Inc. v. Clerks Local 770*, 398 U.S. 235, 249–55, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) (§ 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, accommodated to § 301(a) of the Taft-Hartley Act, 29 U.S.C. § 185(a)); *Nathanson v. NLRB*, supra, 344

it was successful below, the union is free to make such contentions on this appeal.[23] Moreover, our own concern that the important policies underlying the Labor Act be respected in decisions whether to allow rejection of collective bargaining agreements would lead us to a careful scrutiny of the bankruptcy court's exercise of discretion.

The union points out that Kevin Steel has been found to be a violator of the Labor Act in the period before the Chapter XI petition was filed because, among other things, Kevin Steel discriminatorily laid off union employees and refused to sign a new labor agreement. These findings, according to the stipulation of the parties, are not now questioned. The union argues that against this background, the bankruptcy judge should have required, among other things, a showing that the employer is not improperly motivated merely by a desire to rid itself of the union and its adherents, more convincing proof of the company's financial condition, the source of its difficulties and the benefit to be gained by rejecting the contract, and a careful weighing of the equities against rejection, including the loss of intangible employee rights. In support of this position, the union cites *Teamsters Local 886 v. Quick Charge, Inc., supra; In re Overseas National Airways, supra;* and *In re Mamie Conti Gowns, Inc., supra.*

We believe that the union has raised very serious questions, which require careful consideration on remand. The decision to allow rejection should not be based solely on whether it will improve the financial status of the debtor. Such a narrow approach totally ignores the policies of the Labor Act and makes no attempt to accommodate to

them. In *In re Overseas National Airways, supra,* the court emphasized that a bankruptcy court should permit rejection of a collective bargaining agreement

> only after thorough scrutiny, and a careful balancing of the equities on both sides, for, in relieving a debtor from its obligations under a collective bargaining agreement, it may be depriving the employees affected of their seniority, welfare and pension rights, as well as other valuable benefits which are incapable of forming the basis of a provable claim for money damages. That would leave the employees without compensation for their losses, at the same time enabling the debtor, at the expense of the employees, to consummate what may be a more favorable plan of arrangement with its other creditors.

238 F.Supp. at 361–62. This approach is a sound one and the bankruptcy court must move cautiously in allowing rejection of a collective bargaining agreement. See also *In re Mamie Conti Gowns, supra.* The union's brief to us points out a number of alleged deficiencies in the record before the bankruptcy judge. We do not rule upon those issues at this time. Now that we have made clear the district court's power to permit rejection of the contract with the union, we believe it appropriate for that court to reconsider carefully the exercise of the discretion it felt it did not have.

Docket No. 74–2154 is reversed and remanded to the district court for further proceedings consistent with this opinion. The partial consent judgment in Docket No. 74–1872 was approved some time ago. The remainder of that proceeding is remanded to the Board to await the outcome of Docket No. 74–2154.

U.S. at 30, 73 S.Ct. 80, 97 L.Ed. 23 (liquidation of back pay claim by Labor Board, not bankruptcy court); *New York Shipping Ass'n, Inc. v. Federal Maritime Comm'n,* 495 F.2d 1215, 1221–22 (2d Cir. 1974) ("interface between" NLRB and Federal Maritime Comm'n jurisdiction).

**23.** See *United States v. American Railway Express Co.,* 265 U.S. 425, 435–36, 44 S.Ct. 560, 68 L.Ed. 1087 (1924); *Cook v. Hirschberg,* 258 F.2d 56, 57 (2d Cir. 1958); *SEC v. Fifth Avenue Couch Lines,* 435 F.2d 510, 516 (2d Cir. 1970).